# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

JEAN M. CHAPMAN,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

      Defendant.

No. C06-3039-MWB

**REPORT AND RECOMMENDATION**

_____

### *TABLE OF CONTENTS*

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     *PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . **3**

     A.     *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
     B.     *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
         1.     *Introductory facts and Chapman's testimony* . . . . . . . . . . . . **4**
         2.     *Beverly Askvig's testimony* . . . . . . . . . . . . . . . . . . . . . . . . **8**
         3.     *Chapman's medical history* . . . . . . . . . . . . . . . . . . . . . . . . **9**
         4.     *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . **16**
         5.     *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

III.     *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . **19**

     A.     *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **19**
     B.     *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **22**

IV.     *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

V.      *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

_____

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA"). On February 12, 2007, Michael J. Astrue became Commissioner of the SSA, and he hereby is substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d)(1).

## I.  INTRODUCTION

The plaintiff Jean M. Chapman ("Chapman") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title XVI supplemental security income ("SSI") benefits.  Chapman claims the ALJ erred in evaluating the credibility of her subjective complaints, failing to give proper weight to the opinion of her treating physician, and posing an improper hypothetical question to the vocational expert. (*See* Doc. No. 8)

The Commissioner agrees there were errors in the ALJ's decision, and asks the court to remand the case to allow the ALJ to "reevaluate the medical opinion evidence, reassess the credibility of Plaintiff and her mother, obtain opinion evidence from a medical expert on remand, and identify and explain how the evidence supports each limitation in the RFC finding," as well as possibly obtaining further vocational expert testimony.  (Doc. No. 10, p. 5)  The Commissioner specifically argues the record does not support reversal and remand for the immediate payment of benefits because the record evidence indicates Chapman "should be able to perform some work."  (*Id.*, pp. 5-6)  Chapman has not filed any response to the Commissioner's suggestion that the case should be remanded for further proceedings.

Sentence four remand requires a plenary review of the record and "a substantive ruling regarding the case, rather than merely returning the case to the agency for disposition." *Hanson v. Chater*, 895 F. Supp. 1279, 1282-83 (N.D. Iowa 1995) ("Absent a judgment or substantive ruling in the case, a remand is not permitted under sentence four of 42 U.S.C. § 405(g).") (citing *Shalala v. Schaefer*, 509 U.S. 292, 299-300, 113 S. Ct. 2625, 2630, 125 L. Ed. 2d 239 (1993); *Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S. Ct. 2157, 2163, 115 L. Ed. 2d 78 (1991)).  Accordingly, the court undertakes a review of the record to determine whether substantial evidence supports the ALJ's decision that Chapman is not disabled.

2

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On July 7, 2003, Chapman filed an application for SSI benefits, alleging a disability onset date of October 1, 1998.[2] (*See* R. 48-50)  Chapman claims she is disabled due to back pain, nerve damage in her legs, arthritis, and bone deterioration.  She claims these impairments rendered her unable to work as of May 15, 2000, because she is unable to sit, stand, or walk for any length of time due to pain and loss of sensation in her legs.  (R. 57)  A hearing was held in Fort Dodge, Iowa, on March 23, 2005, before ALJ George Gaffaney.  (R. 235-85)  Chapman was represented at the hearing by attorney Ronald J. Wagenaar.  Witnesses at the hearing included Chapman, her mother Beverly Askvig, and Vocational Expert ("VE") Brian Paprocki.  On June 21, 2005, the ALJ ruled Chapman is not disabled.  (R. 12-22)  Chapman appealed the ALJ's ruling, and on April 19, 2006, the Appeals Council denied Chapman's request for review (R. 5-8), making the ALJ's decision the final decision of the Commissioner.

Chapman filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling.   (Doc. No. 3)   In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Chapman's claim.   Chapman filed a brief supporting her claim on September 18, 2006. (Doc. No. 8)  The Commissioner filed a responsive brief and request for remand on November 16, 2006.  (Doc. No. 10)  The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Chapman's claim for benefits.

---

[2]In her brief, Chapman acknowledges that because she applied only for SSI benefits, "the relevant date is the date of application"; *i.e.*, July 7, 2003.  (Doc. No. 8, p. 1)

Case 3:06-cv-03039-MWB   Document 12   Filed 04/12/07   Page 3 of 28

## B. *Factual Background*

### 1. *Introductory facts and Chapman's testimony*

Chapman lives with her two sons, ages thirteen and ten. She lives on public assistance and food stamps, and sometimes child support from her ex-husband. (R. 241) Chapman completed high school, and then had a year of secretarial training in approximately 1988. She had almost a year of accounting courses in about 1998. She did not complete the degree programs for either of these occupations due to personal difficulties unrelated to her health. (R. 244-45)

Chapman's most recent job was working part-time at a friend's craft store during 2001 and 2002. She was paid very little for that work, estimating she earned perhaps $1,000 during each of those years. (R. 240-41) The job required her to use a scroll saw to cut shapes out of wood, and then to paint the objects. She was unable to continue the job due to pain, and stated she would not be able to perform that type of work today due to back pain. (R. 268-69)

During the summer of 2001, Chapman worked for Golden Harvest. She went into corn fields to retrieve samples of corn and seed. She took the seed samples back into a warehouse for testing. She also took readings from a combine, and entered the information into a computer. She indicated the job required her to lift about fifteen pounds regularly. The job apparently was suspended for a couple of months, and when it was available for her to return to work, she declined due to back pain. (R. 269-70)

From 1998 to 1999, Chapman worked at an accounting firm, doing data entry. The job required her to sit at a computer most of the time. She occasionally had to lift a box of copy paper, but otherwise spent her time at the computer. The job was only a temporary position that lasted a few months. (R. 271-72)

4

Earlier positions included mail room clerk, where she had to lift up to twenty pounds at a time, and cook's helper, where she had to lift bags or cans of food weighing up to eight pounds. (R. 272-73)

Chapman stated pain in her back and legs prevents her from working. Although she has pain throughout her back, her primary pain problem is in her low back. She has a scar that begins in the middle of her back, resulting from back surgery on May 27, 2003. Prior to the surgery, Chapman experienced a catching sensation in her left leg when she attempted to sit down. According to Chapman, she would "be stuck in that position," and unable to move. (R. 242) Although the surgery resolved that problem, it left her with constant pain in her back and legs. The pain is worsened by activity, and by changes in the weather. (R. 243, 246) She described her low back pain as a sharp pain that is present all the time. If she moves around very much, the pain radiates into both of her legs, worse on the right. (R. 246) The pain in her right leg occurs at least once a week. Chapman had some type of injection a few days before the ALJ hearing, and according to her, the injection made her leg pain worse, to the point that she was unable even to walk on her right leg after the injection. (R. 246-47)

Chapman experiences some numbness in the back of her left leg. The numbness is on the surface; she still experiences pain in her leg. She described her left leg pain as usually dull, although sometimes it becomes sharp. (R. 246, 248) She indicated she had gone to a pain clinic, taken medication, and done some exercises taught to her by a physical therapist, but nothing has relieved all of her pain, and the physical therapy and exercise actually make the pain worse. (R. 248) She takes twenty milligrams of OxyContin twice daily. She also takes a muscle relaxer. She stated Neurontin also has been prescribed for her, but she sometimes cannot take it due to stomach upset. (R. 249, 259) She has a Lidoderm patch that she uses for breakthrough pain in her lower back. She wears the patch for twelve hours at a time, and stated she uses the patch every two to

5

three days. (*Id.*) She also has taken Amitriptyline, but within the week prior to the ALJ hearing, she had discontinued taking the medication due to nausea and vomiting. She stated her medications make her tired, requiring her to take breaks or short naps during the day. (R. 259, 274)

Chapman stated she has tried to do some walking, and although she did not have pain while she was walking, she later would have so much pain that she would be unable to walk. The ALJ observed that Chapman walks with a limp, which Chapman stated is always present. Chapman estimated she can walk a couple of blocks without experiencing too much irritation in her back. She estimated she can stand for fifteen to twenty minutes at a time, but then her back and legs will hurt and she will have to sit down and elevate her legs. She can sit upright for up to thirty minutes before she has to get up and move around, but even while she is sitting, she has to change position frequently.[3] (R. 249-51, 261) She can drive for fifteen to twenty minutes at a time, but she has someone else drive her longer distances. She experiences some pain relief when she sits with her legs elevated, although if she lies down and elevates her legs, she gets tingling in her feet. (R. 260)

Chapman indicated she is unable to bend over and touch her toes because of back pain. She further indicated her doctors have told her not to bend over at all. She stated that if she were to kneel down or get down on hands and knees, she would require assistance to get back up. She can push a grocery cart, but leans against it for support. She has no problems using her hands, but when it comes to lifting, she cannot lift more than a gallon of milk, which she does with both hands. She can climb stairs with difficulty, but stated she finds going down stairs to be almost impossible because her left

---

[3]The court notes that after riding in the car for thirty-five minutes to get to the ALJ hearing, and then sitting for about half an hour during the hearing, Chapman complained of pain and discomfort, and the ALJ recessed the proceedings so Chapman could take a break and walk around for a few minutes. (R. 260-61) Chapman stated the brief walk helped her discomfort somewhat. (R. 267)

Case 3:06-cv-03039-MWB   Document 12   Filed 04/12/07   Page 6 of 28

leg will not bend properly. Her house is all on one level so she does not have to go down stairs at home. (R. 252-53)

Chapman stated she is able to attend to her personal care needs without assistance. However, she has had to learn to do some things in different ways, such as putting on her pants and tying her shoes. She stated she only takes showers because she is totally unable to get in and out of a bathtub. (R. 254) On a typical day, Chapman gets up at 6:00 a.m., walks around for a bit, eats a piece of toast, and takes her medications. She takes one son to school at 7:00, and then comes home and picks up her other son, who has to be at school at 7:30. When she returns home, she sits with her legs elevated for awhile, and then may do some dishes, laundry, or other household tasks. She takes frequent breaks during household tasks to sit down and elevate her legs. She stated she can do dishes for maybe fifteen to twenty minutes at a time before she has to sit down and rest. (R. 255)

Chapman indicated she makes sure to leave the house every day so she will not just sit at home and become more depressed. She may go grocery shopping, visit her sister-in-law, or walk half a block to her mother's house. Chapman stated she always takes someone with her, usually one of her sons, when she goes grocery shopping because she is unable to lift some of the items or the filled bags. She goes grocery shopping several times a week, buying only a few items at a time so she will not have a lot of groceries to put away at any one time. (R. 255-57) Someone else does the vacuuming in her home, usually either her daughter, mother, or sister-in-law. Chapman has no problems cooking meals for her family. She is unable to do any yard work, and stated her son does the shoveling and mowing.

Chapman stated she sometimes has problems remembering things. Writing down appointments, medications, and the like helps her remember. She stated her memory problems began not long before the ALJ hearing, and she had not yet talked with any doctor about it. (R. 245) She has problems with depression, and takes antidepressants and

7

an anxiety medication. However, Chapman stated her depression symptoms have improved and would not prevent her from working. (R. 253)

At the time of the hearing, Chapman was seeing Dustin Smith, M.D. at Trimark Physicians Group. She had seen Nadeem M. Ahmed, M.D. at Trinity Regional Medical Center's pain clinic, and once Dr. Ahmed got Chapman's pain medications regulated, she resumed monthly visits to Dr. Smith. (R. 257-58) Dr. Ahmed administered steroid injections in Chapman's back. According to Chapman, the doctor injected the steroids into her "spinal fluid" on two occasions, paralyzing her from the waist down for a day, and as a result, she is afraid to have further injections. (R. 258) She indicated Dr. Ahmed had suggested implantation of some type of electrical device in her back, but she was afraid of the treatment and had declined the procedure. (*Id.*)

Chapman stated weather changes affect her back pain, which worsens when the weather gets colder or when a storm is approaching. She indicated she has a "bad day" at least once a week, when she is unable to keep up with her regular activities. On a bad day, she will move from place to place frequently, lying on the couch, sitting in a recliner with her feet elevated, lying in bed, doing light exercise, and trying to get comfortable.

## 2. *Beverly Askvig's testimony*

Beverly Askvig is Chapman's mother. She lives half a block from Chapman. She stated that on Chapman's "bad days," she sees her daughter six or seven times during the day. Otherwise, she may see her once or twice a day, but she also talks with her on the telephone. (R. 262)

Askvig stated Chapman was living on a farm in Minnesota at the time of her accident. After her surgery in 2003, Chapman's parents moved her to Iowa so they could help take care of her. According to Askvig, Chapman's condition improved immediately after surgery, but within about six months, her condition began worsening. Askvig has

8

observed that Chapman is unable to do any heavy cleaning, such as vacuuming and window cleaning. Chapman's oldest son and her parents do most of the cleaning. Askvig does some of Chapman's cooking and Chapman's children take the food to her. Askvig stated Chapman cannot stay at her parents' home because the bathroom is upstairs and Chapman is unable to climb the stairs. Askvig also changes Chapman's sheets every week. (R. 262-64)

In Askvig's opinion, Chapman appears to be in pain frequently. For example, when Chapman tries to do some dishes, Askvig has noticed she will stop and lean on the sink, and "the pain is there, you can see it in her face, and then she'll have to go lay down." (R. 265) When Chapman is in pain, Askvig has noted that she limps and she walks slowly. She has noted that Chapman changes positions frequently when she is sitting or standing. (R. 265-66) Askvig has not noticed any improvement in her daughter from any of the therapies Chapman has tried. (R. 266)

### 3.  *Chapman's medical history*

As noted previously, although Chapman claimed a disability onset date of October 1, 1998, the relevant date for purposes of this case is July 7, 2003, the date she filed her application for SSI benefits. (*See* note 2, *supra*.) The record indicates that on May 27, 2003, Chapman underwent a decompressive lumbar laminectomy of L4-L5, with posterolateral interbody fusion with placement of tangent cortical wedges and pedicle screws, for treatment of bilateral L5 spondylosis with degenerative disc disease at L4-L5. She tolerated the surgery well, and the 'catching' sensation in her leg was relieved by the surgery, but as of June 25, 2003, she continued to complain of ongoing (although gradually improving) pain in both buttocks and the backs of both legs, particularly behind her knees and into her ankles. She was obtaining relief from OxyContin 10 mg twice daily. She demonstrated good strength in her lower extremities. Her neurologist directed

Case 3:06-cv-03039-MWB   Document 12   Filed 04/12/07   Page 9 of 28

her to continue wearing an LSO support brace; to limit her activities to no lifting over ten pounds, with no repetitive lifting, bending, or twisting; and to use good body mechanics with all of her activities. He refilled Chapman's prescription for OxyContin, and directed her to return for follow-up in two months. (R. 111; *see* R. 111-46)

Chapman complained of low back pain during follow-up visits in August, September, and October 2003. Her family doctor, Dustin Smith, M.D., saw her for follow-up on September 4, 2003, when Chapman reported that her surgeon had directed her not to work or even consider physical therapy for two more months. She was no longer in a back brace but was using a TENS unit. (R. 148) At her next follow-up in mid-October, Chapman complained that the OxyContin was too sedating during the day, and did not give her adequate pain control at night. The doctor decreased her morning OxyContin dose and added Flexeril at bedtime. He noted if this combination of medications did not work, he would consider Remeron or Trazodone, but he advised caution due to Chapman's weight gain issues. Her weight was up since her surgery, and up six pounds (to 170 pounds) since her September follow-up visit. (*Id.*)

On January 24, 2004, Dennis A. Weis, M.D. reviewed Chapman's records and completed a Physical Residual Functional Capacity Assessment form. (R. 152-61) Dr. Weis opined Chapman should be able to lift ten pounds frequently and occasionally; stand/walk and/or sit for six hours in an eight-hour workday; push/pull without limitation; and occasionally perform all postural activities. He noted she should avoid concentrated exposure to extreme heat, cold, vibration, and hazards. He found that contrary to Chapman's assertion otherwise, "her condition [had] been gradually improving since the time of her surgery." (R. 160) He anticipated she would have continued improvement in her ranges of motion, function, and reduction in pain symptoms. (*Id.*) On May 14, 2004, J.D. Wilson, M.D. reviewed the record and concurred in Dr. Weis's assessment. (R. 159)

Case 3:06-cv-03039-MWB   Document 12   Filed 04/12/07   Page 10 of 28

On February 12, 2004, David A. Christiansen, Ph.D. reviewed the record and completed evaluation forms relating to Chapman's generalized anxiety disorder. (R. 162-76) He noted that although Chapman had not listed mental health problems on her disability application, the record indicated Chapman suffered from "some depression," and she was being treated with anti-anxiety medications. Dr. Christiansen therefore found it reasonable to conclude Chapman "has medically-determinable impairments that can be evaluated on listings 12.04 and 12.06." (R. 176) He found Chapman to be impaired by "depression vs. dysthymia" (R. 165) and "generalized anxiety" disorder (R. 167), neither of which he determined to be severe. (R. 176) On May 20, 2004, another evaluator reviewed the record and concurred in Dr. Christiansen's assessment. (R. 162)

Chapman continued to complain to her doctors of chronic low back pain throughout 2004. On March 3, 2004, she reported increasing bilateral knee pain. She questioned whether her knee pain could be related to her changed gait pattern since her surgery. X-ray of her left knee showed some early degenerative changes which her doctor opined was "[p]robably early arthritis." (R. 186) He prescribed Naproxen. He also refilled her OxyContin for back pain, and switched her antidepressant from Lexapro to Wellbutrin. (*Id.*) At Chapman's next follow-up on March 10, 2007, she reported she was working with a physical therapist for her back pain, but her pain actually was getting worse and was beginning to feel like it did before her surgery. She also reported some leg weakness. The doctor scheduled an MRI of Chapman's spine and continued her medications. (*Id.*) The MRI, performed on March 16, 2004, showed "[m]ild narrowing of the spinal canal in the transverse dimension at L3-4 and L4-5 as a result of degenerative facet enlargement," and "[c]omplete circumferential encasement of the thecal sac by enhancing granulation tissue at the L4 and L4-5 levels[.]" (R. 179) In addition, the radiologist suspected "[a]t least partial encasement of the L4 exiting nerve rootlets." (*Id.*)

11

At a follow-up visit on June 18, 2004, Chapman reported significant fatigue and continuing back pain. She planned to consult another doctor about the possibility of an epidural injection. Her weight was up to 180 pounds. (R. 184) Dr. Smith referred her to neurosurgeon Nadeem M. Ahmed, M.D. for consultation. Chapman saw Dr. Ahmed on July 20, 2004. The doctor noted Chapman "seemed to be in discomfort and distress," and although she answered questions appropriately, she became emotional at times due to her chronic back pain problem. Dr. Ahmed's assessment of Chapman's condition was "Lumbar degenerative disk disease," "Lumbar facet arthropathy," and "Failed back surgery syndrome." (R. 214) He recommended Chapman try an epidural steroid injection. Chapman agreed, and the injection was performed the same day. The doctor also prescribed Neurontin 300 mg three times daily in a gradually escalating dose; Amitriptyline 25 mg at bedtime; and OxyContin 20 mg twice daily, as prescribed by Dr. Smith. He also discussed other treatment options with Chapman, including physical therapy and spinal cord stimulation, which he thought would benefit Chapman over the long term. (R. 212-15)

Chapman returned to see Dr. Ahmed for another epidural steroid injection on August 20, 2004. Dr. Ahmed increased Chapman's Neurontin dosage to 600 mg three times daily; continued her Amitriptyline as before; and started her on Methadone 5 mg three times daily. (R. 210-11)

Chapman saw Dr. Smith on September 8, 2004, for follow-up. She reported "doing very poorly," despite the epidural injections and pain medications. The doctor noted Chapman had positive straight-leg-raising on the right; "marked limitation in flexion, perhaps being able to flex 30 degrees"; complete inability to pursue any back extension; and "[v]ery limited twisting and bending due to pain." (R. 184) Chapman was tearful during the exam. The doctor administered an injection of Morphine and Toradol, and advised Chapman to continue following up with the pain clinic. (R. 184) Dr. Smith

12

completed an incapacity report form following this exam in which he indicated Chapman's chronic low back pain was permanent, and she was being treated with chronic pain medications. He opined she would be unable to return to normal work duties, and recommended she avoid prolonged sitting, standing, bending, or stooping. He further recommended Chapman apply for long-term disability benefits. (R. 188)

Chapman saw Dr. Ahmed for follow-up on September 20, 2004, and reported she had not experienced much pain relief after the epidural injections. She also was not experiencing much relief from her pain medications, and reported she had received a morphine injection from her family doctor so she could get comfortable. Dr. Ahmed recommended Chapman receive narcotics from only one physician, and she requested that he follow her medication regimen. He increased her Methadone to 10 mg three times daily and her Amitriptyline to 50 mg at bedtime. (R. 204-05) At her next follow-up with Dr. Ahmed, on October 20, 2004, Chapman reported she was "getting good pain relief now with the current regimen of Methadone and Amitriptyline." (R. 200) She indicated the Neurontin was making her sleepy and causing blurred vision. The doctor noted both Neurontin and Amitriptyline could cause the side effects Chapman described. He directed her to decrease her Neurontin dosage gradually, and continue Methadone 10 mg three times daily and Amitriptyline 50 mg at night. She was directed to call the clinic if her symptoms continued, at which time they would try taking her off the Amitriptyline to see if the side effects resolved. (R. 200-01)

Chapman saw Dr. Smith on November 1, 2004, for nausea, vomiting, abdominal pain, and cramping, which she believed was caused by increases in her Methadone dosage. The doctor consulted with Dr. Ahmed, and switched Chapman from Methadone back to OxyContin. He also prescribed a trial of Protonix. (R. 183)

When Chapman next saw Dr. Ahmed, on November 23, 2004, she reported better pain control on the OxyContin, but she had to take 20 mg in the morning and 10 mg in the

13

evening for only moderate pain relief. The doctor noted Chapman exhibited "significant left-sided pain right on the coccyx area," and minimal radicular symptoms. (R. 196) He increased her OxyContin to 20 mg twice daily; continued her on Amitriptyline and Neurontin without change; and prescribed a Lidoderm 5% patch on her lower back area. He noted Chapman might benefit from further epidural steroid injections. (R. 197)

Chapman saw Dr. Ahmed again on December 16, 2004. She reported doing reasonably well since she switched back to OxyContin 20 mg twice daily and started the Lidocaine patch. She had better pain control and she had not increased her use of narcotics. Her pain control was much better than it had been four weeks earlier. (R. 192) The doctor indicated that because 60% to 70% of Chapman's pain was relieved on her current medications, the medication regimen would be "appropriate for long-term use." (R. 193) He noted Chapman could expect to have good days and bad days. Because her condition appeared to be stable, Dr. Ahmed released Chapman back to Dr. Smith for further medication management. (*Id.*)

Chapman saw Dr. Smith on January 17, 2005. He refilled her OxyContin prescription in January and February. Chapman saw the doctor again on March 1, 2005, complaining of low back pain for the previous week. She indicated she felt "something popping." (R. 182) The doctor noted Chapman experienced "significant pain just to palpation in her lumbar area," and she had positive straight leg raising on the right. (R. 190) He referred Chapman back to the pain clinic for consideration of further epidural injections. (R. 182)

Each month from July 2004 through December 2004, when Chapman saw Dr. Ahmed, a nurse questioned Chapman about how her pain was interfering with her daily functioning. At her first visit on July 20, 2004, Chapman indicated pain interfered 100% of the time with her general activities, walking ability, normal work routine, relations with others, and sleep. She indicated pain interfered with her mood 60% to 70%

14

of the time, and with her enjoyment of life 70% of the time. (R. 219) There was little change with regard to the effects of pain on her daily life during August (R. 209) and September, 2004 (R. 207). In October 2004, Chapman reported a slight improvement in her ability to walk and to carry out a normal work routine, indicating pain interfered with those activities 80% of the time. (R. 203) By November 2004, pain again was interfering with those activities 100% of the time. (R. 199) At the time Dr. Ahmed deemed Chapman to be stable and released her to Dr. Smith for medication management, Chapman indicated pain interfered 70% of the time with her general activities, walking ability, and ability to carry out a normal work routine; 30% of the time with her sleep and enjoyment of life; 20% of the time with her ability to concentrate and her appetite; and never affected her mood or her relations with others. (R. 195)

On March 18, 2005, Dr. Smith wrote a report in which he opined as follows regarding Chapman's ability to work:

> Because I am not the patient's surgeon I have not given her strict limitations. I do not believe that she is able to return to a normal work environment. She must always avoid prolonged sitting, standing, bending and stooping. The best case scenario is that Ms. Chapman can cope with her chronic pain. She will most definitely have exacerbations of her pain at times. [Chapman] suffers from significant fatigue, partially induced by her depression and partially induced by medication side effects, i.e. narcotics. Therefore her attentiveness and ability to show up for work on a daily basis may be affected. Over exertion will certainly make the patient's pain and dysfunction worse in the subsequent days.

(R. 190) The doctor further indicated Chapman's prognosis was poor. (*Id.*)

15

### 4.    *Vocational expert's testimony*

Vocational expert Brian Paprocki listed Chapman's past relevant work as follows: (a) cook helper, light as Chapman actually performed it, with lifting in the six- to eight-pound range; (b) mail room clerk, also light, with lifting of fifteen to twenty pounds; (c) data entry secretary, sedentary; and (d) seed sampler for Golden Harvest, light and unskilled, with lifting up to fifteen pounds.  (R. 278)

The ALJ asked the VE the following hypothetical question, considering a woman thirty-six years old as of the date of her application, with a high school education and Chapman's past relevant work experience (R. 278):

> I'm going to give you some hypothetical situations here, several of them.  The first one would be frequent lifting of five pounds, occasionally ten; stand and sit six hours each in an eight-hour work day; walk two blocks; the non-exertional physical limits are all occasional; climbing stairs, ladders, balance, stoop, kneel, crouch, and crawl; environment limits, frequent exposure to heat and cold, vibrations and hazards, frequent only.  If we assume the claimant has this residual functional capacity, could her past relevant work be done either as she did it or as customarily performed?

(R. 279)  The VE responded that the hypothetical individual could perform Chapman's past work as a data entry secretary, both as Chapman performed the job and as it is performed normally.  (*Id.*)

The ALJ next asked the VE to consider the same individual with the added requirement that she be able to change positions every thirty minutes, for a five- to ten-minute break.  For example, the individual would have to be on her feet for ten minutes after thirty minutes of sitting.  The VE stated the data entry job would not be feasible for this individual because the job is performed primarily in a seated posture.  However, he further indicated the individual would have transferable skills that would enable the individual to work in office-type jobs such as a statistical clerk, a receptionist, or a night

16

auditor or hotel clerk. (R. 280-81) The VE indicated each of those jobs would allow latitude between sitting and standing every half hour as required by the hypothetical. (R. 281) The ALJ further indicated that if the individual were unable to do any bending, climbing, stooping, kneeling, or other exertional activities, it should not affect her ability to perform the jobs he had listed, all of which require only minimal exertion. (R. 283) On the other hand, if the individual could not work during the five- to ten-minute breaks, but instead had to rest or walk around, then the VE opined all work would be precluded because the individual would miss too much time throughout the day. (R. 283)

The ALJ asked the VE to consider the same individual as in the second hypothetical, but add the requirement that she be able to elevate her legs while sitting. The VE indicated that would be "an easy accommodation to make," and should not exclude any of the jobs he had noted in his response to the second hypothetical question. (R. 281)

Finally, the ALJ asked the VE to consider the same individual, but add the requirement that she be able to take two unscheduled rest breaks per day to lie down, for thirty minutes each time. The VE indicated this requirement would preclude the individual from any type of competitive employment. (R. 282) The VE further indicated that with regard to any of the three hypothetical individuals, if the individual missed work one day a week, that would preclude any type of employment. He indicated that in general, employers will accommodate one to one-and-a-half days of absence per month. (*Id.*) In addition, if the individual had memory deficits as a side effect from her medications that caused her to be unable to remember simple instructions, she would be unable to perform any of the jobs he had listed. (R. 284)

## 5. *The ALJ's decision*

The ALJ found Chapman had done some work since her alleged disability onset date, specifically her work for the seed company in 2000, and her self-employment making

17

and selling crafts in 2003. However, he further found neither of these periods of employment represented substantial gainful activity. (R. 16) He found Chapman has a severe impairment consisting of degenerative disc disease, status-post laminectomy, with residual pain, but he concluded her impairment is not severe enough to meet or medically equal a listed impairment. (R. 16-17) He found Chapman's depression and anxiety, and her irritable bowel syndrome, not to be severe in nature. (R. 17)

The ALJ found Chapman's subjective complaints not to be credible to the extent Chapman maintains that her pain is completely debilitating. He noted that although Chapman undoubtedly experiences some back pain, she "has maintained the ability to attend to self-care and activities of daily living with some accommodation, repeatedly denied loss of attention or concentration due to pain or pain relief treatment and[] testified that she did not take her medications as prescribed due to side effects[.]" (R. 19) He further noted "these complaints have not been asserted or accommodated by her treating physicians on an ongoing basis." (*Id.*) The ALJ gave no weight to the testimony of Chapman's mother, noting she "cannot be considered a disinterested third party witness whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges." (*Id.*)

The ALJ found Chapman to have the residual functional capacity to lift ten pounds occasionally and five pounds frequently, stand and sit for six hours in an eight-hour workday, walk two blocks, perform all postural maneuvers occasionally, and tolerate frequent exposure to heat, cold, and vibration. (*Id.*) He concurred with Dr. Smith's recommendation that Chapman avoid prolonged sitting, standing, bending, and stooping, and the doctor's opinion that Chapman will experience occasional exacerbations of her pain symptoms. However, the ALJ concluded these limitations would not preclude all types of work, and he specifically rejected Dr. Smith's opinion in that regard. (R. 19-20) The ALJ found that although the state agency consultants had reviewed the evidence adequately, the

18

"new vocational evidence" indicated the state agency consultants' opinions "are no longer fully supported." (R. 20)

Based on the VE's testimony, the ALJ found Chapman had past relevant work as a mailroom clerk, cook's helper, data entry secretary, and sampler. He concurred with the VE's testimony that a person with Chapman's RFC, as found by the ALJ, would be able to return to Chapman's previous work as a data entry secretary. The ALJ further took note of the VE's opinion that Chapman would have transferable skills and could make the vocational adjustment to other sedentary positions such as statistical clerk, receptionist, and night auditor. However, because the ALJ found Chapman could return to her past relevant work as a data entry secretary, he did not make a specific finding regarding other work Chapman could perform. (*Id.*)

Having found Chapman is able to return to her past relevant work as a data entry secretary, the ALJ found Chapman was not under a disability at any time through the date of his decision. (R. 21)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

19

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is

20

considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in

Case 3:06-cv-03039-MWB   Document 12   Filed 04/12/07   Page 21 of 28

significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to

Case 3:06-cv-03039-MWB   Document 12   Filed 04/12/07   Page 22 of 28

support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse

23

the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied,* 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;

24

5)       functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## IV.  ANALYSIS

In the Commissioner's motion for remand, he notes two errors in the ALJ's decision. First, the ALJ relied on the VE's testimony that Chapman's past relevant work included data entry secretary; however, Chapman's earnings record indicates she performed substantial gainful activity only in 1990 and 1991, when she worked as a mail room clerk. The Commissioner therefore concludes Chapman's work as a data entry secretary was not past relevant work because it was not substantial gainful activity. Second, the Commissioner notes the ALJ failed to explain what weight he gave to Dr. Smith's opinion regarding Chapman inability to work. In addition, although the ALJ concurred in Dr. Smith's recommendation that Chapman avoid prolonged sitting, standing, bending, and stooping. the ALJ did not specifically include those limitations in his residual functional capacity assessment. (Doc. No. 10, p. 5)

The Commissioner therefore seeks remand to allow the ALJ to address these errors. Specifically, the Commissioner suggests the case be remanded to the ALJ "who will reevaluate the medical opinion evidence, reassess the credibility of [Chapman] and her mother, obtain opinion evidence from a medical expert on remand, and identify and explain how the evidence supports each limitation in the RFC finding," as well as obtaining additional vocational expert testimony, if necessary. (*Id.*) The Commissioner suggests remand for immediate payment of benefits would be inappropriate because the record evidence indicates Chapman "should be able to perform some work." (*Id.*, pp. 5-6)

25

The court disagrees with the Commissioner's conclusion that substantial evidence in the record indicates Chapman "should be able to perform some work." (*Id.*) On the contrary, the record evidence supports an opposite finding. It is apparent that although Chapman's pain has improved somewhat since her surgery, she nevertheless is severely limited by pain. She takes regular, daily doses of OxyContin, a powerful narcotic pain reliever, as well as other pain medications. She has sought ongoing treatment since her surgery, and there has never been a time when she reported relief in her pain significant enough to allow her to resume normal activity. In addition, recent MRI and X-ray findings indicate the formation of scar tissue in Chapman's back, and evidence of early arthritis in her left knee. Dr. Smith has indicated Chapman's condition is permanent.

The ALJ made much of the fact that Chapman has remained able to attend to most of her self-care needs and activities of daily living "with some accommodation." (R. 19) It is the "accommodation" that precludes Chapman from competitive employment. Chapman must get up and walk around for five to ten minutes after half an hour of sitting, and she must change positions frequently throughout the day. The VE testified that if an individual had to take five- to ten-minute breaks every half hour, and would be unable to work during those breaks, then the individual would be unable to maintain competitive employment. Further, the ALJ failed to take into account the side effects of Chapman's medications, as required by *Polaski*. OxyContin is an opiod agonist, significant side effects of which are somnolence and nausea. *See* www.rxlist.com "OxyContin" (04/12/07). Chapman testified her medications make her drowsy and affect her ability to concentrate, and there are numerous references in the medical records to her irritable bowel syndrome and nausea. The ALJ failed to evaluate Chapman's subjective complaints adequately pursuant to *Polaski*.

The court also finds the ALJ failed to give proper weight to the opinion of Chapman's treating physician, Dr. Smith, which is entitled to great weight. *See Ellis v.*

Case 3:06-cv-03039-MWB   Document 12   Filed 04/12/07   Page 26 of 28

*Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005); *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000). Although the ultimate decision regarding disability is reserved for the Commissioner, *Ellis*, 392 F.3d at 994 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)), a treating physician's opinion regarding a claimant's impairment should be controlling where it is supported by the other substantial evidence of record. *Id.* at 995; *Wiekamp v. Apfel*, 116 F. Supp. 2d. 1056, 1063 (N.D. Iowa 2000) (Bennett, J.) (citing *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). In the present case, Dr. Smith's opinion that Chapman is unable to return to a normal work environment is supported by both the objective medical evidence and the testimony of Chapman and her mother.

Considering the record as a whole, the court finds that not only is the ALJ's opinion not supported by substantial evidence, the record actually contains substantial evidence to support a finding that Chapman is disabled, without further proceedings. The undersigned therefore finds the Commissioner's motion for sentence four remand for further proceedings should be denied, the Commissioner's decision should be reversed, and this matter should be remanded for calculation and payment of benefits.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's motion for remand for further proceedings be denied, the Commissioner's finding that

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Chapman is not disabled be reversed, and this case be remanded for calculation and payment of benefits.

**IT IS SO ORDERED.**

**DATED** this 12th day of April, 2007.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT